# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

---

**Charles Gable,**
And
**Precious Castner**

        Plaintiff,                         **Case No.** 17-CV-463

vs.

**UAC Universal Acceptance Corporation**
And
**Minnesota Repossessors, Inc.**
And
**Chase Towing**
        Defendants.

---

## PLAINTIFFS' BRIEF IN RESPONSE TO
## ALL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

       All three defendants have filed motions for summary judgment. Plaintiffs will respond to each motion herein. For ease of reference, Chase and Minnesota Repossessors will be referred to simply as "Chase," while UAC will be referred to as UAC.

### <u>Summary Of Argument:</u>

       The facts in the record, viewed in a light most favorable to plaintiffs, generally require denial of each motion.

       But in particular, all defendants incorrectly claim that Precious Castner lacks standing; both the FDCPA and Wisconsin Consumer Act confer standing on more than just customers.

       Most significantly, the facts in the record mandate that this Court grant judgment to the plaintiffs by finding that the December 22, 2016 repossession was illegal under section 425.206, Wis. Stats.

1

**Background Facts:**

Most of the factual statements supplied by UAC and Chase are irrelevant to this case.

The significant facts are:

In 2015, Charles Gable purchased a vehicle with credit from UAC. The amount he financed on credit was $6,695. <u>Chase FF 1-3.</u> Because of this, the contract and its enforcement was governed by the Wisconsin Consumer Act.

Payments on the loan were made by Charles Gable, and also by his live-in girlfriend and co-plaintiff Precious Castner. <u>Plaintiffs FF 1-2.</u>

In December 2016, Gable was behind on his payments. That evening, a repo truck backed into his driveway and began pulling his car onto the flatbed of the truck. This driveway is surrounded by other properties and is not private. <u>Chase FF 18.</u> The Chase defendants were operating the repo truck on orders from UAC. <u>Chase FF 20-21.</u>

The repo attempt on 12/22 occurred after 9 p.m. <u>Chase FF 22.</u>  When Gable and Castner realized what was going on, they ran outside with Castner's brother.

Precious told Gable to get into the car  to stop the repossession, and Gable did so. <u>Chase FF 29.</u>  Castner told the repossession men "You do not have a repossession order, you do not have a legal right to take this vehicle, you are not taking it." <u>Plaintiffs FF 3, 6.</u> Gable asked to see papers authorizing the repossession, but was not shown them. <u>Plaintiffs FF 4.</u>

Castner called UAC, and her landlord, and the police. <u>Chase FF 32-34, 37, 39</u>. When the police responded, they told Gable that the repossession could occur. <u>Chase FF 50.</u> Gable and Castner were rushed in removing property, <u>Plaintiffs FF 7-8</u>, and when the car was driven away it had a substantial amount of property still in the trunk. <u>Plaintiffs FF 10, 15.</u>

Gable called UAC to try to find out how to get his car, and his property, back. Plaintiffs FF 11. UAC gave him a number to call, and when Gable called it, he was told he had only two weeks to get the property and must pay $75 to do so. Plaintiffs FF 12. The UAC contract did not allow anyone to charge Gable money for his personal property. Plaintiffs FF 13.

Gable was not able to get to the property right away, and tried to get the company to mail him his property (offering to pay the postage) and tried to get people to drive him to pick up his property. Plaintiffs FF 14-19. When Gable finally did have a chance to go get his property, two days before the 14-day deadline, he called the company only to be told his property had already been discarded. Plaintiffs FF 20.

Gable redeemed the vehicle, but continued to have a dispute with UAC. This led UAC to act in an increasingly hostile manner to Gable. UAC employees claimed Gable and Castner had a "really bad attitude," Plaintiffs FF 57, and UAC managers placed increasing pressure on the employees to get Gable to sign a new contract. Plaintiffs FF 58. UAC employees appeared to make sarcastic comments in notes about Gable and Castner, and finally concluded that the two were "literally paying how they want when they want." UAC employees determined they needed to "take control" of the situation. Plaintiffs FF 59-60. A new repossession attempt was authorized.

On this occasion, the repo agent tracked Gable and Castner to a local gas station, where Gable was parked with his daughter while Castner used the restroom. Chase FF 71, 72. The repo agent pulled a 19 or 20-foot truck up behind Gable's car, parking it perpendicularly to Gable's vehicle. Chase FF 73, Plaintiffs FF 25. The truck was approximately 1 foot behind Gable's bumper. Plaintiffs FF 28. The repo agent came up to Gable's window to talk to him, with Gable's daughter in the car. When Precious came out of the building, the repo agent moved to

intercept her, as well. Plaintiffs FF 33. The repo agent refused to leave despite Castner's telling

him he should not be repossessing the vehicle, and instead directed Castner to call UAC.

Plaintiffs FF 34.

While Castner did that, and then while she called the police[1], the repo agent stood behind

Gable's car. Plaintiffs FF 35. The group waited 15-20 minutes for the police to arrive, Plaintiffs

FF 27.

During this time, Gable's car was up against a curb, with a building alongside the parking

spaces. Plaintiffs FF 30, 31. Gable told a police officer responding to the scene that he felt

blocked. Plaintiffs FF 32. The officer reported that the car was blocked. Plaintiffs FF 36. The

agent did not leave until the police directed him to do so. Plaintiffs FF 37.

UAC's employees in charge of compliance with Wisconsin law have literally *no* training

or education in that law, beyond reading some statutes possibly five years ago. Plaintiffs FF 42,

45-48. UAC has no written directives to vendors on how to comply with Wisconsin law.

Plaintiffs FF 49. UAC's collections manager for Wisconsin at the time of the incidents herein

had no training whatsoever in what Wisconsin requires or allows for repossessions. Plaintiffs FF

51-52.

As a result of the foregoing, Gable and Castner filed this lawsuit, accusing Chase of

violating the FDCPA; and accusing all defendants of engaging in nonjudicial repossession and

false imprisonment, among other claims.

Further facts may be stated in the argument below.

---

[1] Castner actually called her lawyer, and her lawyer called the police.

4

<u>**Plaintiffs' Response to Chase Defendants' Motion:**</u>

**I.**     <u>**Wisconsin holds that a breach of the peace occurs whenever a debtor or someone on their behalf objects to a repossession at the time it occurs.**</u>

Chase argues that this Court should "adopt the balancing test utilized by the Eighth Circuit" to determine if a breach of the peace occurred, and argues that under that test it is entitled to summary judgment. Chase is wrong on both points.

    **A.**   <u>**This Court must follow Wisconsin's law, and particularly the Wisconsin Consumer Act, in deciding this case.**</u>

When a federal court hears a state-law claim under its supplemental jurisdiction, it must apply the forum state's choice of law rules to select the applicable state substantive laws. <u>Felder v. Casey</u>, 487 U.S. 131, 151, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988).

Because the supplemental claims in this case are brought under the Wisconsin Consumer Act, the WCA's territorial scope applies. The Wisconsin Consumer Act applies to any consumer transactions made in the State of Wisconsin, sec. 421.201(1), Wis. Stats. The WCA's provisions relating to creditor's remedies apply to any actions relating to creditors' remedies in Wisconsin. Sec. 421.201(5), Wis. Stats.

It is undisputed that Charles Gable signed the contract in Wisconsin, and that all actions taken by all parties here were performed in Wisconsin. Further, creditors and merchants are prohibited from attempting to apply the law of another state to any Wisconsin consumer transaction, and any such attempt is invalid. Sec. 421.201(10), Wis. Stats.

Because of that, this Court must apply Wisconsin law, and specifically the Wisconsin Consumer Act.

5

**B. Merchants may not resort to nonjudicial repossession if the action constitutes a breach of the peace.**

A merchant is entitled to attempt to exercise nonjudicial repossession of a car, but may not do so if during the repossession the merchant commits a breach of the peace. The phrase "breach of the peace" in the Wisconsin Consumer Act is synonymous with that same phrase under the Uniform Commercial Code, so UCC cases can help courts determine when a breach of the peace occurs. Hollibush v. Ford Motor Credit Co., 179 Wis.2d 799, 508 N.W.2d 449 (Wis. Ct. App. 1993). In addition, pre-UCC/WCA cases may also be considered. Id. 179 Wis.2d at 806-7.

Under the WCA, "when debtor resistance threatens a breach of the peace," the creditor must get a court order to proceed. Hollibush, 179 Wis.2d at 805. The objection need not be verbally conveyed: "if the repossession is verbally *or otherwise contested*… the secured party must desist." Id. 179 Wis.2d at 810 (emphasis added).

In *Hollibush* the Court found a breach of the peace when the debtor' fiance, after seeing that his vehicle was being repossessed, called a lawyer and then said he would call the sheriff; the debtor then said "You are not going to take the Bronco," but the repo agent did anyway.

*Hollibush* cited to (among other cases) Manhattan Credit Co. v. Brewer, 232 Ark. 976, 3241 S.W.2d 765, 99 A.L.R. 2d 354 (Ark. 1961). There, the debtor interrupted a repo attempt and called her lawyer; she then had her husband object to taking the car, and the debtors attempted to get into the car while the repo agent was taking it.

Here, the facts demonstrate that on December 22, after Gable's car was hooked up to the tow truck, Gable and Castner and a third person ran outside. Gable and Castner both sat in the car to keep the repo men from taking it, Gable at 95, ; Castner accused the repossession agents of

6

trespassing, and called her landlord, the creditor, and the police. Gable at 92, 93, 102-103 Gable questioned the reason they were taking the car, gable at 94, and demanded to see the paper that authorized it, but was refused, Id., and Castner told her brother to stand behind the vehicle so that it could not be taken, Gable at 97, and her brother did so, id. at 98.

Atop all of that, Castner specifically testified that she said "No, you do not have a repossession order, you do not have a legal right to take this vehicle, you are not taking it."

Under the circumstances, this is *clearly* a breach of the peace; it is undisputed that the vehicle *was* actually taken on December 22, and these circumstances are *identical* to the *Hollibush* and *Manhattan Credit* cases.

**C.  The cases cited by Chase are misconstrued and do not support Chase's arguments.**

Chase mis-states the holdings in the cases it cites, and does not apply the facts of *this* case correctly to the opinions it wants this Court to follow.

Chase says *Bednarz v. Lovald,* No. 15-C-0458, 2016 WL 6304705, at *8 (E.D. Wis. Oct. 27, 2016) says no Wisconsin court has yet determined whether a "debtor's initial objection" may be overcome by a debtor later changing his mind; but in *Bednarz*, the Court denied summary judgment because there was an issue of fact about whether the debtor had, in fact, changed his mind – because the alleged change of mind may have been occasioned by the repo agents having Bednarz arrested.

And, undermining Chase's position, the *Bednarz* Court suggested that the "mere presence of police officers" might be a breach of the peace:

> At this time, the court does not find, as a matter of law, that the mere presence of police officers when the Bednarz's vehicle was repossessed constitutes a breach of peace where (and if) the officers were responding to the earlier gun incident. The material facts of this case are in dispute.

7

<u>Bednarz</u> at p. 12.

Nor does <u>Clarin v. Minnesota Repossessors, Inc</u>., 198 F.3d 661, 664 (8th Cir. 1999) help

Chase; there, the Court began its analysis by saying that "[c]ourts are divided on the issue of

whether an unequivocal oral protest amounts to a breach of the peace," but *Wisconsin* courts

have no such division; *Hollibush* was clear that any verbal or unequivocal protest made the

repossession a breach of the peace under Wisconsin law – as *noted by the Clarin court,* which

cited to *Hollibush* in this way:

> <u>Census Fed. Credit Union v. Wann, 403 N.E.2d 348</u>, 352 (Ind. Ct. App. 1980) (in
> the face of an oral protest the repossessing creditor must desist); <u>Hollibush v. Ford
> Motor Credit Co., 508 N.W.2d 449</u>, 453 (Wis. Ct. App. 1993) (same).

<u>Clarin</u> 198 F.3d at 664. Wisconsin does not weigh factors; it holds that a protest to the

repossession makes it a breach of the peace. But even under the *Clarin* factors, this case would

be a breach of the peace. This repossession took place at Gable's residence, making it *more* of a

breach of the peace under *Clarin*. The actions of the parties were disruptive: they ran out and

jumped into a car that was being hauled onto a flatbed truck, demanding to see paperwork and

claiming a trespass. And Chase would not show Gable or Castner the paperwork they said

authorized them to take the vehicle – making this more deceptive than the *Clarin* repossession,

where the repo men showed the debtor a copy of the order. And any argument that Gable and

Castner consented by allowing the repossession after the police ordered them to do so is  vitiated

by the fact that Gable and Castner had no choice but to comply with the police's orders, and, as

in *Manhattan Credit*, it at least raises a question of fact when 'consent' is only obtained with the

intervention of police acting in the absence of any court order.

8

In <u>Moore v. Capital One N.A.</u>, No. CV 14-4745 (DSD/SER), 2016 WL 1627604, at 2 (D. Minn. Apr. 22, 2016), the repossession took place in the middle of the night, with nobody around; there was no confrontation or protest whatsoever.

Chase actually cites *Moore* for the idea that somehow Gable and Castner consented to an illegal repossession, but reading the contract that way would be illegal under Wisconsin law: a customer may not waive or forego rights or benefits under the Wisconsin Consumer Act. Sec. 421.106(1), Wis. Stats., so any clause consenting to an illegal repossession would be invalid.

And in <u>Revering v. Norwest Bank Minnesota, N.A.</u>, No. CIV.99-480/RHK/JMM, 1999 WL 33911360, at *4 (D. Minn. Nov. 30, 1999), the Court held that a breach of the peace (under Minnesota law) "requires violence or the threat of violence, or the commission of some other offense." This is not the law announced by *Hollibush,* and here the debtors did not invite the repo men into their house and calmly read papers; they squatted in the car to prevent its removal, demanded proof of the right to take their car, and called their landlord, the creditor, and the police to try to stop the matter, doing all of that in public around other buildings and people.

Wisconsin does not employ the five-factor *Clarin*/UCC test to determine if a breach of the peace occurred; it simply says that any breach of peace which threatens the public is a breach of the peace, and specifically that any repossession which takes place after the debtor has contested the taking in person is a breach of the peace. This Court must find that the December 22 repossession was a breach of the peace and violated section 425.206(2), Wis. Stats.

## II. Precious Castner has standing under the Wisconsin Consumer Act and Fair Debt Collection Practices Act because those laws allow any person injured to sue, not just customers or debtors.

Chase next argues that Precious Castner's claims under the FDCPA and WCA must be dismissed, because Castner did not sign the contract and thus had no legal obligation to pay the debt. Chase's argument is frivolous, and ignores well-settled state and federal law.

Castner makes claims under 15 USC 1692f, sec. 425.206, Wis. Stats.[2] sec. 427.104, Wis. Stats., and section 425.109, Wis. Stats.[3] To maintain these claims, she must only be a 'person injured,' and whether she signed the underlying document or not is irrelevant to that inquiry. Zehetner v. Chrysler Fin. Co. LLC, 2004 WI App 80, 272 Wis.2d 628, 679 N.W.2d 919. (Wis. Ct. App. 2004).

*Zehetner*, which Chase's brief fails to mention at all, is almost *directly* on point for this argument. There, Zehetner went with her boyfriend to an auto show, and signed a purchase contract; the two signed a credit application, and other documents, but Zehetner never actually signed the contract that obligated her to pay for the car. 2004 WI App par. 5. When a default on the loan occurred, Zehetner made six payments on the car, before learning that she was not obligated to do so and suing the creditor. The Court of Appeals expressly held that Zehetner did not need to be a "customer" to sue, noting that nothing in section 427.105(1), Wis. Stats. (the statute conferring a right to damages for violations of chapter 427) limited the recovery to "customers." 2004 WI App 80 at par. 20. The Court specifically noted that this construction was in accordance with the WCA's liberal interpretation rules:

---

[2] The Third Cause of Action in the complaint.
[3] The Fifth Cause of Action in the complaint.

> Certainly an attempt to compel a consumer to make payments in the absence of
> any legal obligation to do so could constitute an "unfair, deceptive, false,
> misleading and unconscionable practice" that could undermine the development
> of fair practices in consumer transactions.

2004 WI App 80 at par. 19.

Thus, Castner has a claim under section 427.104 if she has been injured by the violation. Castner's claims are that the defendants held her personal property and demanded payment for it, that the defendants took a vehicle she used and had made payments on illegally, and tried to do so a second time. She alleged each of these violates section 427.104, Wis. Stats.[4]

Like the WCA, the FDCPA extends its protections to noncustomers. As held in Todd v. Collecto, Inc., 731 F.3d 734 (7th Cir. 2013) the FDCPA at section 1692k(a) extends its protections to any *person* injured, and held that "the reach of sec. 1692f is readily apparent… anyone agrrieved by a debt collector's … practices" can sue under that provision.

Both *Zehetner* and *Todd* are controlling in this case; Chase's failure to even *mention* those cases is a questionable litigation tactic at best, and those cases take care of Chase's argument regarding standing.

### III.     The evidence in this case is sufficient for a jury to find in favor of the plaintiffs on the claims of conversion, violation of 15 USC sec. 1692f, and theft.

Chase then lumps together several arguments related to the personal property claims.

---

[4] The analysis of whether Castner can make a claim under sections 425.109 or 425.206 is irrelevant; there can be only one remedy for each violation, and if Gable is awarded those damages then Castner cannot double recover the penalties or double up on court orders. Nonetheless, Castner is a "customer" for purposes of the illegal repossession claim, as she testified that she made payments on the car. A "customer" I sa person who "acquires… property… for personal purposes." Castner made payments on the car, thereby acquiring property, and when the Court finds an illegal repossession, it will have to award her "any sums paid to the merchant pursuant to the transaction," sec. 425.305(2), Wis. Stats.

The evidence in this case is that Gable called UAC and was directed to call a different number. Gable did so and was told he had to pay $75 to recover his personal property, and that he only had two weeks to do so. Gable was not told what the fee was for, but the contract used by UAC does not allow a fee for collection of personal property. When Gable then called back within that two week period to claim his personal property, he was told it had already been disposed of. Gable and Castner listed numerous items that were still in the car when it was driven away from them on December 22.

As for whether the repossession company was an agent of UAC's, while this will be dealt with more directly in response to UAC's own motion for summary judgment, it must be discussed here, as well, in brief: UAC requires that repossession company policies are in accord with UAC's own.  Plaintiffs FF 38-39. UAC uses a contract with repossession agents. Plaintiffs FF 40. UAC dictates to repossession companies what they are to do with personal property in the car at the time of seizure. Griffin Ex. 1, p. 48. The repo company is to simply store the property until claimed. Id. The repo company is not paid any storage fees of any sort. Id.

It is in that light, taking that evidence in the way most favorable to Gable and Castner, tha the Court must consider each claim related to the personal property.

A. **The Chase defendants violated 15 USC 1692f because the contract did not allow for a personal property fee, so the money could only have been applied to UAC's debt, unless Chase was simply gouging the plaintiffs.**

In Nadalin v. Automobile Recovery Bureau, Inc., 169 F.3d 1084 (7th Cir. 1999) the Court of Appeals noted that a claim for a violation of 15 USC 1692f would be appropriate if the seizure was done with the intent to satisfy the plaintiff's debt towards the principal.

Here, the contract allowed no charges for the seizure, return, or holding of personal property taken in connection with the loan. So the *only* explanation from this record would be that the money was intended to go to UAC to compensate it for something owed by Gable or Castner; this is compounded by the fact that Gable was referred to the unknown person on the other end of the phone call by UAC, and the unknown person gave no indication that they were not acting on behalf of UAC. The repossession company is limited to a maximum $200 per vehicle repossessed, and that money is paid by UAC, not by a debtor. Griffin Ex. 1, p. 48.

Looking at the evidence in the light most favorable to Gable and Castner, a jury could conclude from this evidence alone that the $75 was intended to be a payment to UAC; the demand was made by a company at a phone number provided by UAC, the repossession company was prohibited by contract from claiming any money for storage of the property, and UAC was at the time actively trying to get Gable and Castner to pay it money.[5]

B. **The facts in the record would allow a jury to find that Chase converted the personal property.**

It is undisputed that the personal property left in the car, as listed by Gable and Castner, was not returned to them, and Gable's testimony was that when he called to redeem the property with his $75 he was told it was already gone.

The elements of tortious conversion in Wisconsin are:

(1) intentionally controlling/taking property belonging to another;

(2) controlling/taking property without the owner's consent; and

---

[5] UAC's counsel took pains to remind Gable that he "owed more than $220 on December 29th or 30th" to UAC, Gable Dep. At 210, and that UAC "allowed you to pay less than you actually owed to redeem the vehicle on December 29th or 30th." Id. at p. 211.

13

(3) those acts resulting in serious interference with the rights of the owner to possess the property.

Bruner v. Heritage Companies, 225 wis.2d 728, 593 N.W.2d 814 (Wis. Ct. App. 1998). By itself, conversion does not include wrongful intent or knowledge that what is being taken rightfully belongs to another. See Eden Stone Co. v. Oakfield Stone Co., 166 Wis.2d 105, 124, 479 N.W.2d 557, 565 (Ct.App.1991).

While Chase may contend that Gable and Castner are wrong and that there was no personal property in the vehicle when it was taken – an assertion that itself is belied by the fact that somebody employed by one of these defendants told Gable there *was* personal property and he would have to pay $75 to get it back --  the facts in the record are sufficient for a jury to believe Gable and Castner that the defendants repossessed their car with their daughter's Christmas presents in it, among other items, and then got rid of all that property even before the (illegal) deadline to claim it had passed.

    C. **Because the Chase defendants took the vehicle with no right to possession, and did so to help make a profit, a jury could conclude they violated section 895.446, Wis. Stats.**

A seizure of a vehicle in violation of Wisconsin's nonjudicial repossession limits violates section 425.206, Stats., and results in no possessory right. Kett v. Community Credit Plan, 228 Wis.2d 1, par. 11, 596 N.W.2d 786 (Wis. S. Ct. 1999).

Section 895.446 of the Wisconsin statutes provides a civil remedy for people suffering losses as a result of criminal actions. Sec. 895.446(1), Wis. Stats. If a defendant engages in intentional activity that violates section 943.20, Wis. Stats., and causes damage or loss to a person, that

person can sue for actual damages, plus treble damages as exemplary damages. Sec. 895.446(1) and (3)(a) and (b), Wis. Stats.

Section 943.20(1)(a) is one of the criminal statutes under which an action may be brought for violation of section 895.446. That subsection makes it a crime to intentionally take and carry away or retain possession of movable property without the other's consent and with the intent to deprive the owner permanently of such property. This Court must find the existence of a theft in order to rule in Duncan's favor on this claim. Zilges v. Kenney Bank & Trust, (ED WI 2015).

The intent required under section 895.446 is the intent to use the property for something inconsistent with the rights of the owner. See State v. Sobkowiak, 173 Wis.2d 327, 338, 496 N.W.2d 620 (Wis. Ct. App. 1991). Intent may be inferred from the facts and is proven by a preponderance of the evidence. SJ Properties Suites v. EP Milwaukee, 759 F.Supp.2d 1032, 1041 (ED WI 2010). Evidence of a motive to make a profit can demonstrate intentional activity in violation of the statute. Stathus v. Horst, 2003 WI App 28, par. 11, 260 Wis.2d 166, 659 N.W.2d 165 (Wis. Ct. App. 2003) (Intentional decision to refuse to disclose defects that were affecting sale was sufficient to warrant treble damages.)

Both with respect to the personal property, and the car, the facts in the record demonstrate that on December 22, 2016, none of the defendants had the legal right to take the car or the personal effects; their doing so in order to make a profit or recoup money lent allows a jury to infer that the defendants intended to violate Wisconsin law in the repossession, and thus demonstrated sufficient intent to allow the claim under section 895.446 to proceed.

The Chase defendants want to convince this Court that they did not steal the personal property or convert the vehicle; but they cannot do so on summary judgment, where the facts in the record and the reasonable inferences from them must be viewed in a light most favorable to

15

the nonmoving plaintiffs. Gable and Castner's testimony shows that there was a breach of the peace. As a result of that, the seizure of their car and personal property on December 22 under the facts set forth in the record would allow a jury to find that the property was converted and that the $75 sought from Gable as a condition of receiving his property was going to be applied to the UAC debt.

IV.     **Because the plaintiffs' movements were restricted against their will in the March repossession attempt, a jury could find that the defendants falsely imprisoned the plaintiffs.[6]**

Wisconsin adopted the Restatement of Torts (2d), section 35, as its version of false imprisonment. Maniaci v. Marquette University, 50 Wis.2d 287, 295, 184 N.W.2d 168 (Wis. 1971). Under Wisconsin's common law, a defendant is guilty of false imprisonment if

(a) he acts intending to confine the other or a third person within boundaries fixed by the actor, and

(b) his act directly or indirectly results in such a confinement of the other, and

(c) the other is conscious of the confinement or is harmed by it.

Id.

The action for this tort protects a personal interest in freedom from restraint of movement. "The essence of false imprisonment is the intentional, unlawful, and unconsented restraint by one person of the physical liberty of another." Herbst v. Wuennenberg, 83 Wis.2d 768, 774, 266 N.W.2d 391 (Wis. 1978), citing to Dupler v. Seubert, 69 Wis.2d 373, 381, 230 N.W.2d 626 (1975).

---

[6] Chase makes a brief argument about whether the March 29 incident was a breach of the peace; plaintiffs have not alleged such a claim and will not respond to this argument. The breach of the peace was on December 22, 2016.

Where a defendant causes a plaintiff to remain where he or she did not wish to remain, it is false imprisonment. WIS JI-Civil 2100. One may be confined by words or acts or both. Id. Wisconsin has found false imprisonment where a defendant prevented his fiancée from changing her location (State v. Ednmonson, 2008 AP 839 (Wis. Ct. App. 2009), where defendant drove the victim in an SUV and refused to take her home, State v. Becerra, 09 Ap 600 (Wis. Ct. App. 2010)[7], and even a *hug that went on too long*, State v. Long, 2009 WI 36, 765 N.W.2d 557 (Wis. 2009).

Chase makes three arguments, none of which are supported by the facts here or the law.

Chase argues that the repossession agent had the "lawful" right to the "temporary placement of his vehicle behind the Kia." Chase offers no legal support for the claim that a "repossession order" – by a creditor, not a court – allows a flatbed tow truck to park perpendicularly to a set of parking places and block the egress of a vehicle in those places.

Chase also suggests that Gable and Castner's 'continued presence' was of their own making, but their only "proof" of that is a claim that Gable could have maneuvered his car out of the parking lot somehow. But the testimony from *Gable* is that the agent was approximately 1 foot behind his car, and the agent agreed he was standing behind Gable's car. Gable would have had to try to back his car up, *without hitting the agent*, and without *ramming it into the curb in front of him*, and continue edging back and forth in such a manner until he had turned his car perpendicular itself, and then somehow left the parking lot.

---

[7] "The elements of false imprisonment do not require the victim to either scream for help or put up a struggle." Id. at par. 19.

The mere existence of some theoretical escape route does not prevent imprisonment from being illegal. State v. Burroughs, 2002 WI App 18, 250 Wis.2d 180, 640 N.W.2d 190[8]. There, the victim was taken to a strange apartment, but the defendant contended that because she had entered voluntarily, and because the door was not barred and there was a first-floor window she could have gone through without injury, that she was not "sufficiently confined," but the Court of Appeals disagreed, finding that the defendant's threats towards the victim, as well as his guiding her away from the door, resulted in confinement.

Here, Castner and Gable were mindful of the prior attempt to take their car, and were in a public area blocked by a large truck.[9] The parking spaces they were in ran alongside the building. Johnson Dep. At p. 70. The agent physically stood behind the car as while Precious Castner was on the phone. Id. p. 71

The acts of parking the Gable vehicle in, moving the truck only one foot from the car, then moving to the driver's side door, and then intercepting Precious as she came out of the building, and then *standing behind the car* all are actions which are intended to further confine Gable and Precious; there is at the least a material issue of fact as to whether they were falsely imprisoned.

Finally, Chase argues that the agent had no intention of falsely imprisoning the plaintiffs, but under Wisconsin law his intention is shown if he "knew that confinement or restraint would be substantially certain," WIS JI-Civil 2100, element 2. A jury could find that the agent's actions in March 2017 were taken knowing that confinement or restraint would be substantially certain – especially when the agent pulled the truck perpendicular to the Gable vehicle; the truck would

[8] Although in *Burroughs* the defendant was convicted of kidnapping, the Court of Appeals held that the "false imprisonment statute" was a "cousin" to the kidnaping statute, and cited to the criminal version of the false imprisonment jury instructions.
[9] The repo agent testified the truck was "18, 19 feet" in length.

18

have to be *backed up* to actually load the car (as it had been on December 22), so the only purpose in pulling the truck up the long way would be to block off as much of an exit route as possible.

From those facts, a jury could conclude that the confinement was substantially certain, and that the repossession agent's acts and words were sufficient to confine the plaintiffs to an area the repossession agent wanted to hold them in.

## PLAINTIFF'S RESPONSE TO UAC's MOTION

### I.    UAC's arguments on standing have no more merit than Chase's claims.

UAC begins its brief, too, by arguing that Castner has no standing. UAC, like the Chase defendants, makes no mention of *Zehetner* and *Todd*, and for the same reason as in the foregoing, UAC's motion must be denied.

UAC also argues that it is the installment sales contract that is at issue here, arguing that the contract "triggered the applicability of the WCA notice provisions," but Castner is not arguing that the repossession was without notice; she is arguing that the *repossession* was illegal. The contract does indeed make the WCA apply to this transaction, including efforts to enforce it; but Castner need not be a signatory to the contract to be protected from illegal repossessions.

### II.    UAC's compliance with the WCA notice provisions does not help it escape liability for an illegal repossession and conversion of property.

UAC then argues that it "complied with the WCA" by giving notice of default and notice of intent to repossess. Again, the plaintiffs are not claiming that notice was insufficient; although there were allegations that notice had not been received, the plaintiffs' suit alleges that UAC "obtained possession of plaintiffs' automobile", Complaint par. 48, knowing they had no right to do so (because of the breach of the peace), Id. pars. 46a, 51, 54, 59.

19

UAC then flatly states that "Gable's claims for violation of the WCA's debt collection provisions … fail to the extent they are based on alleged non-judicial repossession." UAC provides no support for the proposition that because they sent the required pre-seizure notice, they can then take the vehicle in breach of the peace, and section 425.206(2), Wis. Stats., flatly overrules any such argument.[10]

UAC argues that it cannot be held liable for actions taken by others, but that will be dealt with further down, in response to UAC's more developed argument on that point.

### III. The Plaintiffs' Interrogatory and Deposition testimony are sufficient to prove emotional distress under the WCA and FDCPA.

UAC attacks Gable and Castner's proof of emotional distress damages by citing a host of cases that have *absolutely no bearing on this matter*. Gable and Castner are entitled to sue for emotional distress caused by violations of the WCA; section 427.105(1) makes this *abundantly clear*, and like other inconvenient laws and case holdings, is ignored by the defendant.

Section 427.105(1) in fact *specifically* holds that emotional distress and mental anguish damages may be sought 'with or without accompanying physical injury'.

No Wisconsin court has ever construed the level of proof required to demonstrate emotional distress under section 427.105. However, Wisconsin courts have held that litigants can sue for emotional distress caused by intentional activity which inflicted 'substantial other damages'. *Anderson v. Continental Ins. Co.*, 85 Wis.2d 675 271 N.W.2d 368 (1978). There, the

---

[10] All defendants make much of the fact that Gable was in default of the transaction; but the nonjudicial enforcement provisions of the WCA *presuppose* that a default has occurred; the statute (included under *creditor's remedies*) says that collateral can be seized when there is a judgment in favor of the merchant, or when a notice of default has been given, two occasions when the customer would be at least *arguably* in default on the transaction. Sec. 425.206(1)(b) and (d), Wis. Stats. But in that same statute merchants are expressly prohibited from taking possession of collateral if doing so would commit a breach of the peace. Sec. 425.206(2)(a), Wis. Stats. It is no protection to say that they only breached the peace because Gable was in default.

Supreme Court distinguished between the specific tort of intentional infliction of emotional distress, and seeking emotional distress damages based on being the victim of a different intentional tort:

> In respect to a claim for emotional distress, we note that the plaintiffs herein alleged that each of the defendants acted "so as to maliciously and intentionally depress, distress and harass plaintiffs." Because the focus of all parties on this appeal was upon the question of the availability of the tort of bad faith, we do not determine whether damages for mental or emotional distress are allowable under the pleadings of this particular lawsuit. Some generalities in respect to damages for mental distress, we believe, are however appropriate.
>
> In negligent torts, mental distress is compensable only when there is an accompanying or resulting physical injury. … I*n intentional torts, substantial other damages in addition to damages for emotional distress are require.*…. Where the tort is specifically that of the intentional infliction of emotional distress, no other damages need be alleged or proved. However, additional limitations are imposed on a cause of action for the intentional infliction of emotional distress. A plaintiff must prove that the purpose of the conduct was to cause emotional distress, that the conduct was extreme and outrageous, that it was the cause in fact of the plaintiff's injury, and that the plaintiff suffered an extreme disabling emotional response….
>
> *By contrast, where the intentional tort of bad faith is alleged, the defendant's conduct need not be extreme and outrageous. An intent to cause emotional distress need not be shown*. There need only be a showing of the knowledge or reckless disregard of the lack of a reasonable basis for denying or refusing to honor or negotiate on an insured's claim. ….
>
> In the absence of pleading and proof of the intentional infliction of emotional distress, however, the tort of bad faith falls within the second category described above, where substantial other damages in addition to the emotional distress are required if there is to be recovery for damages resulting from the infliction of emotional distress. In the bad faith cause of action against an insurance company, *we therefore conclude that to recover for emotional distress in the absence of pleading and proof that there was an intentional infliction of emotional distress, the plaintiff must plead and prove substantial damages aside and apart from the emotional distress itself and the damages occasioned by the simple breach of contract*.

85 Wis.2d at 695-96 (emphasis added, internal citations omitted.) The ability to seek emotional distress damages is available in any intentional tort. See Bauer v. Murphy, 191 Wis.2d 517, 530 N.W.2d 1 (Ct. App. 1995). Courts have implicitly recognized that a litigant may seek emotional

distress damages for violations of a Wisconsin statute. See <u>Diedrich v. Ocwen Loan Servicing</u>, 839 F.3d 583 (7th Cir. 2016)(Allowing a claim for emotional distress from violations of chapter 224 but denying claim because the distress was not caused by the violation.)

In addition, actual damages under the FDCPA include emotional distress. <u>Goodin v. Bank of America</u>, 114 F.Supp.3d 1197 (MD Fl 2015). The violations need not be the only cause of stress in the debtor's lives. <u>Id. at 1210.</u>[11]

When the injured party's own testimony is the only proof of emotional damages, the circumstances must be explained in reasonable detail. <u>Denius v. Dunlap</u>, 330 F.3d 919 (7th Cir. 2003), cited in FDCPA context in <u>Crafton v. Law Firm Levine</u>, 957 F.Supp.2d 992 (ED WI 2013). Testimony that a plaintiff suffered embarrassment, mental anguish and distress, caused by 'constant worry' about actions that might be taken, and coupled with embarrassment about revelation of her personal matters, was sufficient to support an award of emotional distress damages in <u>House v. Shapiro</u> (ED WI 2011). See also <u>Moreland v. Dorsey Thornton & Assocs.</u>, (ED WI 2011)(Awarding emotional distress damages where plaintiff suffered embarrassment and distress worrying that son would be arrested.)

Both Charles and Precious gave substantial detail in their interrogatories about the distress they suffered.

Charles Gable talked about the stress caused by the repossession on December 22, stress that led to him cutting himself:

> Gable did cut himself because of this stress. He went and cut the outer part of his left arm. He used a kitchen knife. Gable felt the most pain and stress when his 5-year-old daughter approached him after their car was towed and told him "It's going to be okay." Gable hated the fact that he would be unable to provide his daughter any Christmas presents because they were stolen out of the trunk of their

---

[11] The FDCPA and WCA are to be coordinated, sec. 421.102(2)(d), Wis. Stats., so rulings about how to prove emotional distress under the FDCPA are applicable to section 427.105, Wis. Stats.

car along with the rest of their personal belongings. Gable and Castner could not afford to buy their daughter replacement Christmas presents.

The day that Gable had cut his left arm, him and Castner got into a fight that night. It was one of their worst fights they had had in their relationship. After this fight, all Gable could think about was harming himself because of everything that had happened with their car and consequently after that happened after their car being taken away.


In addition to the cutting and the fight with Precious, Charles suffered extreme stress reactions as follows: After the repossession on the 22nd Charles did not speak for nearly 2 full days afterwards. Charles did not speak for those two days because he was so overwhelmed by what had happened that he could not process the events and felt as though he had no options.

Charles began to experience extreme paranoia and still suffers from that to this day. When he hears sounds that are reminiscent of a tow truck, he will run outside to see what's going on with his car. At Charles' job, whenever he can he will park his car parallel to the drive through, so that he can see if there is a tow truck trying to remove his vehicle. When he hears these sounds his heart feels like it jumps into his throat and his mind starts going "90 miles per hour" and he cannot think straight and has extreme difficulty organizing his thoughts. Near their house is a train track that sounds something like a tow truck and Gable, whenever he hears this train coming through, will get up and his car.

Charles has felt nauseous at times since these events. He describes the feeling as having his 'whole world flipped upside down' and having the "s**t scared out of him" because they could take it once and he fears they could take the vehicle again. This feeling visits him whenever he thinks his car might be gone. When he wakes in the morning he says a prayer that his car has not been taken and feels as though he might vomit. Everytime he fears that his car has been taken or thinks about these events, which is nearly every day, he feels as though he might vomit. Charles has lost weight because of this, and is down about 40 pounds since these events took place. He has trouble nearly every night falling asleep, and wakes a lot during the night. He will try to go to bed around 10 p.m. on his days off, or around 1 p.m. on days he works (he works second shift). It usually takes him 2-3 hours to fall asleep, and then he will wake up about every 1 to 1 ½ hours. Charles has tried over the counter remedies for this including melatonin and Tylenol PM and Nyquil-type sleep aids.

Charles fears going anywhere in the car unless he has someone who can sit in the car while he goes about his business, to avoid it being seized again.

In addition, Charles had to walk to and from work for nearly two weeks in December and January 2016-2017, in the cold rain and snow. He had to arrange for rides for his daughter and his wife.

Charles in particular has felt like a failure because of the events of December 22; after the events took place and after his daughter told him things would be okay, Charles began to feel like a failure and has each and every day since those events re-run the incident through his head and felt miserable. Remembering the incident

23

has caused him to cry, and he feels "emotionally compromised" by these events. He feels as though the events ruined his life and nearly ruined his relationships with Castner, his daughter, and his friends. He was "snapping" at people – being short with them and having a short fuse on his temper, yelling at coworkers, friends and family when they did not deserve it.

<u>Gable, ints 7 and 21.</u>

Precious' responses are equally detailed:

Precious has felt paranoid since these events. Any thing that reminds her of a tow truck in vision or sound makes her scared. When she thinks she sees a tow truck her adrenaline starts to flow and she feels like she is going to have to battle with them, that her car might be blocked in or her car might be taken. She worries each day that someone will come and take her car illegally again. She has someone sit in the car while she grocery shops, or have someone sit in the car while she shops, and has to hurry her shopping to avoid inconveniencing the other person.

Her life has become "one giant hoop," after the events alleged herein. She spends "every minute" at work wondering if someone is towing her car, and when she parks the car at work she likewise parks where she can be alerted if someone is trying to tow her car. She feels as though she is "on edge," making her nauseous; at times she has suffered from diarrhea or constipation because of stress. She feels as though she is always waiting for the "next shoe to drop."

Precious has always suffered from some insomnia, but feels as though these events have worsened that insomnia. Before when she could not sleep she would at least be able to relax and think about other things, but since the events alleged herein she finds herself focusing on the repossession and worrying it will happen again. When she hears car sounds while she is awake it makes her adrenaline spike and she has to worry again.

Precious feels that this has made her crabbier and because she is pregnant she is worried that her anxiety and paranoia will affect her unborn baby.

These events nearly destroyed Precious' relationship with Charles. These events caused them to fight more than they ever had. Prior to these events the couple might fight from time to time but these were minor and sporadic; after these events because of the stress caused and the worry and paranoia, Precious feels that her fear is causing her to distrust others including Charles, and this leads to more fights.

Precious feels that her emotions are harder to control since these events, and that as a result she is more emotional in general.

24

Precious refuses to leave much property, if any, in the car anymore. She worries each and every day that the car will be repossessed again.

Precious worries that her daughter will realize what is going on and will be affected adversely by this. Precious' daughter has seen tow trucks and asked whether the truck is there for them. This causes Precious to become heartbroken because her daughter should not have to worry about whether a truck will come take her car and remove her property and presents.

Ints. 21.[12]

Gable said he feels like his "life has been turned upside down," that he can't eat or sleep and "[h]alf the time [he] can't think straight because [he's] always worried about somebody coming to pick up [his] car." Gable Dep. At p. 207.

At his deposition, Gable testified that he had his daughter's presents in the car when it was taken. Gable Dep. P. 113. Gable testified to this conversation about that repossession:

> When… all three of us got back in the house, I was watching the car leave, and I sat down on the couch, and my daughter comes up to me, and as a – sorry—as a four-year-old, come up to a father and tell me that Daddy, everything's going to be okay.

Gable Dep. At p. 200. The second time, in March, Gable said his daughter said "Daddy are they going to come and take the car again," and when he said he hoped not, she said "Please don't."

Gable Dep. At p. 202. At his deposition Gable said, about the cutting, that it occurred (in part) because "it's hard… being a father and trying to provide for your family, it's really hard when somebody takes something away that you—you need. And it – it put a lot of stress on me."

Gable Dep. At p. 192.

This is sufficient evidence to get to a jury on emotional distress damages.

---

[12] Interrogatory responses may be used to the extent allowed by the federal rules of evidence, FRCP 33c. Since they are sworn responses, the interrogatories are admissible as Gable and Castner's testimony.

UAC also argues that none of *its* actions could have caused the distress; this argument will be dealt with in the section concerning UAC's direct and indirect liability, below.

UAC notes that the defendants have other emotional or psychological issues, but as noted in *Goodin*, supra, this is no bar to recovering damages caused by an illegal action.

UAC says that because Precious said the fight was caused by her being angry that Charles had missed payments and not told her, it cannot be held liable, but the fight *only* started *because UAC came to get the car*; UAC's actions in illegally seizing the car that night were a substantial factor in precipitating that fight. UAC says "[n]either of them can point to anything UAC did to cause them to experience whatever distress they may have experienced," but this suit and the plaintiffs' testimony does *just that*: Gable and Castner had to try to avoid their car being taken against their will on December 22, in front of their daughter, *with her Christmas presents in it*; they then had to try to come up with money – *again, at Christmas time* – to redeem the car that had been illegally repossessed, and once they did so, were told their personal property had been disposed of; then, after that, they were *blocked into a parking lot*, again with their daughter there, for nearly a half-hour while UAC tried *again* to repossess the vehicle. Even if the *first* argument was entirely unrelated to UAC's actions (it wasn't), the remainder of the distress Charles and Precious felt was *certainly* due to UAC's course of conduct.

IV. <u>**Wisconsin law holds that illegal repossessions are proper subjects for punitive damages, and the evidence shows both deliberate disregard of rights *and* malice.**</u>

Wisconsin expressly allows punitive damages in breach of the peace repossession cases. <u>Hollibush</u>, *supra*. "We see no reason why punitive damages may not be awarded" in a breach of the peace case.) Such damages are awardable where there is proof the defendants' conduct is malicious or in intentional disregard of the rights of the plaintiff. Sec. 895.043(3), Wis. Stats.

26

Proving an intentional disregard does not require proof of an intent to cause injury. Wosinski v. Advance Cast Stone Co., 2017 WI App 51, par. 75, 901 N.W.2d 797 (Wis. Ct. App. 2017). In *Wosinski*, evidence that the defendant deviated from the design plan without getting prior approval, combined with proof that the materials used were not safe, were sufficient to show the "heightened state of mind" that went beyond ordinary negligence, and allowed a jury to award punitive damages. Id. at par. 77-78. The statute requires a 'purposeful disregard' of the plaintiff's rights, which is demonstrated whenever a defendant is aware that his or her acts are substantially certain to result in the plaintiff's rights being disregarded." Roehl Transp. Inc. v. Liberty Mut. Ins. Co., 2010 WI 49 par. 190, 325 Wis.2d 56, 784 N.W.2d 542 (Wis. S. Ct. 2010).

UAC's conduct here is *especially* egregious. UAC produced two witnesses in this case: April Lutz and Don Griffin.

Griffin is the president of UAC. Griffin Dep. At p. 4. Griffin's lack of knowledge about UAC's operations is shocking. He was not aware whether procedures for notices of right to cure default were written or not. Griffin Dep. At p. 8. He was not aware of what policies were in effect for taking notes on accounts at the time of the incidents involved in this case. Griffin Dep at p. 13.

Griffin was the UAC employee in charge of overseeing repossessions in Wisconsin. Griffin Dep at p. 17. Despite that, Griffin's sole training in Wisconsin law governing repossessions was "20 plus years experience in the business," plus "outside legal firms" reviewing some documents. Griffin Dep at p. 18. Griffin also said that he had "reviewed Wisconsin law himself," Id. at 19. He did this by "look[ing] up the actual statutes," at least five years ago. Id. at p. 20. Griffin, despite being in charge of Wisconsin repossessions, said he was

not "the best person" to describe UAC's repossession procedures. <u>Griffin Dep at p. 22.</u> UAC has

nothing in writing to direct how UAC wants Wisconsin repossessions done. <u>Griffin Dep at p. 21.</u>

April Lutz was no better. Ms. Lutz was the collections manager for UAC at the time.

<u>Lutz Dep. P. 5 (R. 27-1)</u>. Despite that she has had no specific education or training in Wisconsin

law as it relates to repossession. <u>Id.</u> With no education or training in Wisconsin law of

resposession, Ms. Lutz is responsible for ensuring that repossession companies hired by UAC

comply with UAC procedures. <u>Lutz Dep at p. 7.</u>

UAC gives no information to its vendors on how to comply with state or federal law

other than a contract that requires them to comply with state and federal law. <u>Lutz Dep p. 13.</u>

Engaging in repossessions of consumer collateral without *any* legal training or review

beyond "reading the statutes," and failing to give any directions *whatsoever* to vendors on how to

comply with Wisconsin law, are actions that are 'substantially certain' to result in violations of

Wisconsin law, and on that basis alone the punitive damages claim should continue.

There is also evidence that UAC's attitudes towards the plaintiffs became malicious.

After initially offering modifications of loans, UAC seemed to take on a more belligerent tone

towards Gable. By January 3, 2017, UAC employees were complaining that callers had a "really

bad attitude," <u>Griffin Dep ex 1, p. 12.</u> On January 17, a manager reviewed the loan and in all

caps instructed employees "LETS GET MOD SIGNED," <u>Id. p. 15</u>, one of five ALL CAPS

instructions given in a two week period.

On March 3, UAC employees described the caller as "very rude and ar[g]umentative" Id.

at p. 14. On March 29, a note that reads *sarcastically* begins with "auth[13]" called in, saying

---

[13] "Auth" means an "authorized person".

she can pay $235 today and she wants to sign the modification – THE MODIFICATION THAT WE PROPOSED BACK IN JAN – the modification she tld us she wasn't going to sign almost 4 weeks ago.

Id. at p. 15, emphasis and spelling in the original.

The very next line says: "**customer is literally paying how they want when they want we need to take control**." Id. (Emphasis added).

From all that, a jury could infer not just that UAC's attitudes toward Gable and Castner were malicious, viewing them as not accepting UAC's proposals and attempting to "take control" by ordering a new repossession that resulted in the false imprisonment.

There is sufficient evidence to get to a jury on punitive damages.

**V.**      **UAC's direct and indirect involvement allow it to be held liable for both its own actions and those of the Chase defendants.**

UAC's section V argument against the conversion and civil theft claims are essentially a more-specific version of its argument, at section VI, that it had no liability for third-party repossession companies. As such, the sections will be discussed together.

Again, UAC's arguments fail to reference any statute or case law, and again, both militate against ruling in UAC's favor.

Under the Wisconsin Consumer Act, "debt collection" is "any action, conduct or practice" taken "in the collection of claims owed… a merchant." Sec. 427.103(2), Wis. Stats. Section 427.104 prohibits debt collectors from taking the prohibited actions, and a debt collector is anyone who "directly *or indirectly*" engages in debt collection. Sec. 427.103(3), Wis. Stats. (Emphasis added.)

Creditors and merchants may be held liable for violations committed by people they hire to collect debts. <u>Patzka v. Viterbo College</u>, 917 F. Supp. 654 (WD WI 1996). There, Viterbo argued there was no 'agency relationship' sufficient to hold it liable for actions taken by a debt collector it had hired, saying that Security Credit was an independent contractor. The court held that "[a]s a matter of public policy, holding creditors liable for the acts of collection agencies they utilize on a regular basis advances the purposes" of the FDCPA and WCA. 917 F. Supp. At 661.

Viterbo's actions did not direct or control the manner in which the collector acted; the college received payments received by collection efforts, and was the primary source of information about the debt; Viterbo also could tell the collector to hold off on collection efforts.

UAC's involvement is *far* greater. As noted, UAC requires contractors to enter into a contract that says they will comply with Wisconsin law. In addition, the records here show that UAC was directing the vendors at each significant step, or consenting to and ratifying their actions.

On the 22nd, UAC received Castner's call, informing them that the company was at the house; instead of instructing the vendor to leave the scene to avoid a breach of the peace, UAC told Castner that she must pay up and told her how she could get the car back. <u>Griffin Ex. 1, p. 11.</u>  UAC then exercised its authority in the collection of repossession fees ("LOWER PYNMTS TO $110/BWKLY STARTING 1-13 PLUS $10 REPO FEES PLAN"), <u>Id.</u>, provided information about the auto auction, <u>Id.</u>, told the plaintiffs where the car was and offered to send a release to the vendor when payment was received, <u>Id. p 12</u>, defended the vendor from a claim for theft ("she keeps saying they stole there [sic] stuff—tld her no they didn't – its common for them to remove items/plates"), <u>Griffin Ex. 1 p. 12.</u>  UAC provided the information about Charles and his

car and his address to the vendors, <u>Griffin Ex. 1 P. 67.</u> UAC told the vendors when to start and stop repossession efforts. <u>Griffin Dep. Ex. 1, p. 68-73.</u>

UAC has more direct control and more direct involvement than Viterbo College did in *Patzka*; given the facts in this case, and given the WCA's inclusion of creditors as debt collectors, this Court must find that UAC is liable for its vendor's actions in the illegal repossession.

### VI. <u>The plaintiffs should be allowed to bring an affirmative claim for unconscionable behavior in violation of section 425.107, Wis. Stats.</u>

UAC then tries to dismiss the plaintiff's claim for unconscionable behavior, arguing that it cannot be held liable for such behavior under the FDCPA. The plaintiff's claims are made under section 425.107, Wis. Stats. That section allows a court to refuse enforcement of a consumer transaction, or limit enforcement, if it finds any conduct directed towards the customer, or "any result of the transaction" to be unconscionable. Sec. 425.107(1), Wis. Stats.

UAC makes no argument that section 425.107 cannot be enforced against it beyond the claim that it is not an affirmative claim for relief.

*Riel v. Navient Solutions Inc.*, No. 16-CV-1191 (ED WI 2017) held that section 425.107, Wis. Stats., based on its placement in the statutes, was only allowed to be used as a defense to a collection action. Plaintiffs (whose lawyer, admittedly, represented *Riel*) disagree with the court's ruling in that case.

Section 425.107 confers a *right* upon customers: the right to be free of unconscionable actions directed at them. Although section 425.107 is included under "Creditors' Remedies" in Chapte4 425, unlike the other provisions of that section, it does not spell out steps a creditor must take or actions that are allowed creditors; instead, it describes a *customer*'s rights to be free

31

from certain types of actions. Its placement in subchapter I of section 425 should not be taken as the sole meaning to be ascribed to the section.

Section 425.301 provides, as part of a *customer*'s remedy, that "[a]ny right or obligation declared by chs. 421 to 4217 is enforceable by action," unless the particular statute itself limits its own effect. Sec. 425.301(2), Wis. Stats.

Section 425.107 does not limit itself to only serving as a defense to lawsuits; reading it as such unnecessarily limits a customer's rights to avoid unconscionable behavior to *only* those situations where the creditor has both engaged in such behavior *and* filed suit; so that here, for example, Gable and Castner would have no right to seek a limitation on unconscionable behavior unless and until UAC filed a lawsuit.

Such a crabbed reading of the statute is not in keeping with the dictate of the WCA that customers "be put in at least as good a position as if the creditor" had complied with the WCA, sec. 425.301(1), Wis. Stats. A customer harmed by unconscionable actions cannot be "put in at least as good a position" as he would have been if he cannot bring a claim under 425.107 until the creditor sues him.

This Court should not adopt the *Riel* argument, and instead should hold that customers may make affirmative claims under section 425.107.

## Conclusion:

UAC and the Chase defendants spend dozens of findings of fact (each with multiple findings couched inside the paragraph) and dozens of pages arguing about things that do not matter to this case, while ignoring *clearly controlling* case law and statutes, and the reason for that is clear: under direct scrutiny, when applying the correct law, UAC and Chase must lose this motion (and, ultimately, the trial.)

32

There can be no doubt that the events of December 22, 2016, violated Wisconsin law; what happened that night was far more of a breach of the peace than occurred in *Hollibush*, and the *only* response the defendants can claim is to ask either that the Court not hold them responsible (UAC) or that the Court apply the law of some other state than Wisconsin (the Chase defendants.) This Court can do neither; Wisconsin law mandates that UAC be held liable for the actions of its agents, and Wisconsin law makes clear that the repossession that night was illegal, and the court should direct summary judgment in the plaintiffs' favor, finding all defendants violated section 425.206, Wis. Stats.

Beyond that, the facts in the record are ample enough for a jury to find that the defendants' actions regarding the personal property and the second repossession attempt also violated Wisconsin law; and a jury could also conclude that the second repossession attempt, in particular, was motivated by a malicious intent towards debtors UAC viewed as paying what they wanted when they wanted.

This Court should grant judgment on the one count, deny the motions on the remainder of the plaintiffs claims, and allow this case to be tried to a jury.

Dated: This 30th day of May, 2018.

**Lawton & Cates, S.C.**
*Electronically signed by:*

_____/s Briane Pagel_____
Attorney Briane F. Pagel
State Bar No. 1025514

P.O Address:
345 W. Washington Ave. Suite 201
P.O. Box 2965
Madison, WI
P: 608.282.6200
F: 608.282.6252
bpagel@lawtoncates.com