UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CHARLES GABLE, *et al.*,

        Plaintiffs,

    v.                                      Case No. 17-C-463

UNIVERSAL ACCEPTANCE
CORPORATION (WI), *et al.*,

        Defendants.

---

## DECISION AND ORDER GRANTING-IN-PART AND DENYING-IN-PART SUMMARY JUDGMENT

---

Plaintiffs Charles Gable and Precious Castner sued Defendants Universal Acceptance Corporation (WI) (UAC), Minnesota Repossessors, Inc. (RPI), and Chase Towing and Transport, Inc. (Chase), for damages arising out of the defendants' efforts to repossess Gable's car in late 2016 and again in early 2017. Gable and Castner asserted claims for violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*, against RPI and Chase, as well as additional state statutory and common law claims against them and UAC. The court has jurisdiction over the FDCPA claims under 15 U.S.C. § 1692k(d) and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367. The case is before the court on a motion for summary judgment by UAC (ECF No. 24) and a combined motion for summary judgment by RPI and Chase (ECF No. 21). For the reasons stated below, summary judgment will be denied on the FDCPA claims against RPI and Chase. Summary judgment will also be denied as to the state law claims for conversion and violations of Section 427.104, and as to Gable's claim of illegal nonjudicial repossession, but granted

as to Castner's claim for illegal nonjudicial repossession, and both plaintiffs' claims for unconscionable behavior and false imprisonment.

## I. BACKGROUND

The following background facts, set forth in the light most favorable to Gable and Castner as the nonmoving parties, are taken from the undisputed portions of the parties' proposed findings of fact. In July 2015, Gable bought a 2004 Kia for $6,695 and entered into a motor vehicle retail installment contract with Interstate Auto Group, Inc., (IAG). Under the terms of the agreement, IAG retained a security interest in the vehicle. IAG later assigned its interest in the contract to UAC. Under the agreement, Gable agreed to make bi-weekly payments of $149. Gable also agreed that if an amount greater than one full payment remained unpaid for more than 10 days, then the lender could accelerate the loan and take possession of the vehicle and any personal property contained within it. Gable could reclaim the personal property within 30 days. Castner was not a party to the retail installment contract, is not listed on the purchase contract, and is not a titled owner of the Kia. Gable missed at least two payments under the retail installment contract. On September 9, 2016, UAC sent Gable a Notice of Right To Cure Default and Regarding Repossession by certified letter identifying the payments he had failed to make and notifying him that UAC intended to repossess the vehicle if he failed to cure his default within fifteen days. The notice also advised Gable that if he believed he was not in default or objected to UAC taking possession of the vehicle, he could demand that UAC proceed in court by notifying UAC in writing within fifteen days of the notice. Gable claims not to have received this notice. A second stand-alone Notice of Repossession was sent on November 4, 2016. Although United States Postal Service records show the notice was delivered to an individual at Gable's address on November 7, Gable claims he did not receive it. In any event, he did not demand a court hearing.

Under a contract with UAC, RPI works as an independent, third-party repossession company to repossess vehicles assigned to it by UAC. UAC's contract with RPI expressly classifies RPI as an independent contractor and not an agent of UAC. Pursuant to a repossession order from UAC, two RPI employees, Michael Johnson and Chris Brunette, proceeded to repossess the Kia from the driveway adjacent to Gable's home in Neenah, Wisconsin, on December 22, 2016. When Johnson and Brunette arrived, they parked their flatbed tow truck behind the Kia, confirmed that it had the appropriate vehicle identification number, attached winch chains to both sides of the vehicle frame, and began winching the Kia onto the tilted flatbed. Gable saw the truck backing up to his car when it arrived around 9 p.m., and he, Castner, and Castner's brother came out of the dwelling when the Kia was approximately halfway up onto the bed of the tow truck. Gable entered and sat in the Kia while it was partially winched onto the flatbed.

"With someone in the vehicle, Johnson was unsure of what to do, as he did not believe it would be proper or safe to unchain, unwinch or lower the car as long as someone was inside. As a result, he was not able to release the vehicle from its present [tilted] position and was not able to safely leave the scene under those circumstances." ECF No. 37, ¶ 30. Apparently, Johnson never offered to leave without the vehicle if Gable exited it so he could safely release it. In any event, while Gable was in the Kia, Castner called UAC for him. UAC PFOF ¶ 14. During the call, a UAC representative advised Castner that Gable's account was past due and that he would need to make at least one payment to stop the repossession. *Id.* ¶ 15. After speaking with UAC for about fifteen minutes, Castner called the police. RPI PFOF ¶¶ 37–39. Castner told Johnson that the police were on their way, at which time Johnson decided he should stay at the site and leave the vehicle in the half-winched position. *Id.* ¶ 44. Johnson reasoned that it would not be appropriate to leave after

being advised that the police were coming; he believed that they would have questions for him and Brunette. *Id.*

When police officers arrived, they spoke with Gable and Castner separately from Johnson and Brunette. *Id.* ¶¶ 47–49. Either Johnson or Brunette showed an officer the repossession paperwork, but neither of them asked the officers to do anything at the scene, remove Gable from the vehicle, or otherwise facilitate the repossession of the Kia. *Id.* Eventually, a police officer told Gable that Johnson and Brunette had the right to take possession of the Kia and that he should remove his personal property from the vehicle. *Id.* ¶ 50. Gable, Castner, and Castner's brother began removing items from the car, and Castner's brother made at least five trips into the house while the police officers remained on the scene to supervise. *Id.* ¶¶ 50–52. The parties dispute how this unloading process proceeded. Gable and Castner assert that Johnson or Brunette repeatedly told them to hurry up and would not let them access the trunk, which contained tools, blankets, and their daughter's Christmas presents, as well as other personal property. Pls.' Proposed Findings of Fact (PPFOF) ¶¶ 7–10, ECF No. 38. RPI counters that Johnson and Brunette never told anyone what they could or could not take from the Kia and never rushed the process. RPI PFOF ¶ 51. Johnson testified at a deposition that he expressly told Gable and Castner that they could remove items from the trunk, and he had no idea why they stopped doing so without removing everything. ECF No. 26-2 at 55–59.

There is no dispute that, while Gable, Castner, and her brother were removing property from the Kia, Gable gave Johnson the key to the vehicle in a cooperative fashion, without any statement, objection, or protest about doing so. RPI PFOF ¶ 54. Before leaving, Johnson and Brunette explained to Gable and Castner how to reclaim the Kia from a secured lot where it would be stored

4

in Green Bay. *Id.* ¶ 55. After Johnson and Brunette left with the Kia, Gable and Castner got into an argument because Gable had lied to Castner about missing payments. *Id.* ¶ 62.

Following the repossession, Gable called UAC about reclaiming his property and was directed to call a different number. PPFOF ¶ 11. Gable does not dispute that RPI subsequently told him that, if he wanted to reclaim any personal property left in the Kia, he would have to make an appointment to pick up the personal property from RPI's storage facility in Green Bay. RPI PFOF ¶¶ 65, 67. Nor does Gable dispute that RPI also told him that he would have to pay $75 in order to recover his personal property, though he does not know whether that amount reflects a storage fee or an administrative fee. *Id.* ¶ 67. Gable further claims that he was told that he had only two weeks to reclaim his property. PPFOF ¶ 12. When Gable initially asked to speak with an RPI manager about making an appointment to reclaim his property from RPI's storage facility, he was told that no manager was available and he would have to call back. *Id*. Gable called back on a later date and said that he had $75 available but no transportation to Green Bay (he testified at his deposition that this was because he did not want to drive the Kia on the freeway), and RPI declined his request to mail or otherwise deliver the personal property to him. *Id.* ¶ 18; ECF No. 26-1 at 141–42. Ultimately, Gable never made an appointment to pick up his property. RPI PFOF ¶ 67. Nobody at UAC ever told him that he needed to pay UAC to recover his personal property. *Id.*

Within two weeks of the December 22, 2016 repossession, Gable paid a portion of the amount past due on his account with UAC, and UAC authorized him to retrieve the Kia from an auction site where it was being held. UAC PFOF ¶ 17. Around the time that Gable recovered the vehicle, UAC offered to modify his loan to lower the bi-weekly payment amount, but Gable declined the offer. *Id.* ¶ 18. On March 24, 2017, UAC reauthorized RPI to begin making repossession attempts again because of a lack of payment by Gable. *Id.* ¶¶ 20, 33.

On March 29, 2017, Johnson attempted to repossess the Kia for RPI at a gas station where it was parked in Fox Crossing. *Id.* ¶ 21; RPI PFOF ¶ 72. RPI indicates that Johnson used a truck with a "Chase Towing" logo to attempt this repossession. ECF No. 29 at 1 n.1. Johnson parked the tow truck behind the vehicle, and when he found Gable sitting in the parked vehicle, he told him that he was there to repossess the car. RPI PFOF ¶¶ 73–74. At some point, Castner exited the gas station, told Johnson that he could not repossess the car, and called both UAC and the police. *Id.* ¶¶ 84–85. When Castner told Johnson she had called the police, he agreed to wait for officers to arrive in order to explain the situation to them. *Id.* ¶ 85. When the police officers arrived after fifteen to twenty minutes, an officer spoke with Johnson while another spoke with Gable and Castner. *Id.* ¶ 89. After the officers conferred, they recommended to Johnson that he leave, so he did. *Id.* ¶¶ 89–90. Before the officers asked Johnson to leave, nobody had asked him to move his truck. *Id.* ¶ 92. The Kia was not repossessed in March 2017. *Id.* ¶ 95. Gable has not made a payment to UAC since early 2017, and he continues to be in default on his obligations. UAC PFOF ¶ 33.

On March 30, 2017, the plaintiffs filed this action. Their complaint asserts six separate claims for relief: (1) violation of the FDCPA; (2) violations of the Wisconsin Consumer Act (WCA); (3) conversion and violation of Wis. Stat. § 895.446; (4) illegal nonjudicial repossession; (5) unconscionable behavior; and (6) false imprisonment. Gable and Castner assert claims two through five against all defendants, but they allege that only RPI and Chase violated the FDCPA and that only Chase effected a false imprisonment.

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment seeks to avoid the time and expense of a trial when there are no material facts in dispute that require a trial to resolve. Summary judgment should be granted

when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, all reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (quoted source and internal quotation marks omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

With these standards in mind, I now turn to the specific claims of the complaint.

## III. ANALYSIS

### A. Plaintiffs' FDCPA Claims

#### 1. The December 22, 2016 Repossession

The plaintiffs allege that RPI and Chase violated the FDCPA by repossessing the Kia on December 22, 2016, over their unequivocal objection. The FDCPA expressly prohibits a "debt collector" from using "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. The term "debt collector" generally "is defined as excluding repossessors and other enforcers of security interests, 15 U.S.C. § 1692a(6), except that a repossessor may not take or threaten to take nonjudicial action to dispossess a person of property if 'there is no present right to possession of the property claimed as collateral through an enforceable security interest.'"

*Nadalin v. Auto. Recovery Bureau, Inc.*, 169 F.3d 1084, 1085 (7th Cir. 1999) (quoting § 1692f(6)(A)). That is precisely what the plaintiffs allege RPI and Chase did here: dispossess the plaintiffs of their property when the defendants had no present right to possession of the property claimed as collateral. Neither RPI nor Chase dispute that this provision applies to them. Instead, they contend that they properly repossessed Gable's Kia on December 22, 2016.

"Courts presented with the issue of determining whether a repossession agency has violated § 1692f(6) look to the applicable state self-help repossession statute which identifies the circumstances under which an enforcer of a security interest does not have a present right to the collateral at issue." *Alexander v. Blackhawk Recovery & Investigation, L.L.C.*, 731 F. Supp. 2d 674, 679 (E.D. Mich. 2010) (citing *Purkett v. Key Bank USA, N.A.*, No. 01–C–162, 2001 WL 503050, at *2–3 (N.D. Ill. May 10, 2001)); *see also Bednarz v. Lovald*, No. 15-C-458, 2016 WL 6304705, at *2 (E.D. Wis. Oct. 27, 2016). Wisconsin law allows nonjudicial repossession of motor vehicles if the customer has failed to demand a hearing in response to the notice provided under Section 425.205, as long as the merchant does not "commit a breach of the peace." Wis. Stat. § 425.206(1)(d), (2)(a). UAC gave the required notice here. Under Section 425.205(1g)(c), a merchant is presumed to have given notice "if the merchant sent the notice by certified or registered mail." Thus, no violation of the FDCPA occurred unless the repossessors committed a breach of the peace.

Wisconsin courts, like most courts, do not require an actual breach of the peace in order to hold that a repossessor violated Section 425.206(2)(a). It is enough to show a breach of the peace if the repossessor takes the car over the debtor's unequivocal objection. *See Hollibush v. Ford Motor Credit Co.*, 179 Wis. 2d 799, 808, 508 N.W.2d 449 (Ct. App. 1993) ("When the creditor repossesses in disregard of the debtor's unequivocal oral protest, most courts find the creditor guilty

of a breach of the peace." (quoting 2 J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE § 27–6, at 580 (3d ed. 1988))). The reason for the rule that self-help repossession in the face of a debtor's contemporaneous objection constitutes a breach of the peace is to prevent violence:

> The underlying theory of the UCC cases is that a verbal objection to a repossession is the precursor to violence, and that it should not be necessary for a debtor to resort to violence to provide the breach of the peace necessary to defeat a self-help repossession. This potential for violence exists whether or not a replevin judgment exists. Repossessions are emotional matters, and a paper judgment does not calm this emotion.

*Id.* at 811–12. Thus, in *Hollibush*, the court found a breach of the peace as a matter of law based on the undisputed fact that "Hollibush and her fiancé told FMCC's agent that he was not to repossess the vehicle, and that he nonetheless did so." *Id.* at 812.

In this case, there is strong evidence that Gable and Castner objected to the repossession of Gable's car before it was accomplished. The plaintiffs contend that Castner explicitly told the repossession agents that they did not have a legal right to take the car, and Gable got into the car at Castner's direction, even though Johnson and Brunette had already begun hoisting it onto their truck. RPI and Chase dispute that Castner made such an unequivocal statement and assert, somewhat disingenuously it would seem, that Johnson did not know why Gable got into the car, suggesting that he may have needed to make a phone call. RPI and Chase also offer the undisputed factual assertion that Johnson was unsure what to do because he believed it was unsafe "to unchain, unwinch, or lower the car as long as someone was inside," and so he could not leave the scene. Even if Gable and Castner did object initially, RPI and Chase contend that they changed their mind after police were called, removed their personal property from the car, and gave Johnson the keys. Thus, RPI and Chase contend they are entitled to summary judgment.

The fact that Gable and Castner acquiesced in the repossession after the police arrived and informed them the repossession was lawful, however, does not mean that they withdrew their

objections to RPI and Chase's conduct. The police officers were simply wrong in their conclusion that Johnson and Brunette were legally entitled to take the car over the debtor's objection. *See Marcus v. McCollum*, 394 F.3d 813, 819 (10th Cir. 2004) ("[O]fficers may act to diffuse a violent situation but may not aid the repossessor in such a way that the repossession would not have occurred but for their assistance."); *see also Jackson v. City of Milwaukee*, No 12-CV-490, 2013 WL 3154073, at *2 (E.D. Wis. June 20, 2013) (holding that allegations that police officers called to scene by debtor's mother aided in self-help repossession of car violated plaintiffs Fourth Amendment rights states claim under 42 U.S.C. § 1983). Gable and Castner were obligated to comply with the police officer's directions regardless of whether they wanted to do so in order to avoid arrest. Their compliance does not relieve RPI and Chase of liability for violating the FDCPA.

RPI and Chase cite this court's decision in *Bednarz v. Lovald* for the proposition that when a debtor changes his mind and consents to the repossession, even in the presence of police, no breach of the peace occurs. No. 15-C- 458, 2016 WL 6304705 (E.D. Wis. Oct. 27, 2016). But *Bednarz* differs in a significant way from the facts of this case. In *Bednarz*, the defendant called police after the debtor confronted him with a handgun as he was trying to repossess the debtor's car. The court denied summary judgment to both parties because there was a factual dispute over whether the police were called to investigate the firearm incident and the plaintiff then changed his mind about the repossession, or whether they were called to assist in the repossession and the debtor turned over his keys to the vehicle because of the police presence. *Id.* at *6. Here, it appears clear that Gable gave his keys to Johnson because he was mistakenly told by police that Johnson had a right to take the car. Implicit in the court's conclusion in *Bednarz* is the holding that if the police presence caused Gable to turn his keys over to the repossessor, a breach of the peace occurred.

Thus, *Bednarz*, properly construed, supports the plaintiffs' claim that the December 22, 2016 repossession was in violation of Wisconsin law.

RPI and Chase also contend that Castner lacks standing to bring a claim under the FDCPA because she was not the debtor. These defendants note that Castner was not married to Gable and that she was not a party to any automobile purchase or loan agreement. Thus, even if Gable's FDCPA claim survives, RPI and Chase contend that Castner's claim should be dismissed. The Seventh Circuit has concluded, however, that it is "readily apparent" under § 1692f that "anyone aggrieved by a debt collector's unfair or unconscionable collection practices can fall within the provision's zone of interest." *Todd v. Collecto, Inc.*, 731 F.3d 734, 739 (7th Cir. 2013) (determining that individual possessed standing to sue for debt collection practices despite not being the consumer who incurred the debt). Here, Castner alleges that her personal property was improperly taken as a result of RPI's and Chase's violation of 15 U.S.C. § 1692f. If true, then Castner is entitled to relief. She thus has standing at least as to that part of the plaintiffs' claim.

RPI and Chase are therefore not entitled to summary judgment on the claim arising out of the December 22, 2016 repossession of Gable's 2004 Kia. Indeed, were the court to grant summary judgement to either party, it would be more inclined to grant summary judgment on this claim to the plaintiffs. Given RPI's and Chase's factual contention that Gable changed his mind, however, and since there remain factual disputes that require a trial in any event, I conclude that it is more prudent to await a more complete record for either the jury or, if the evidence allows only one conclusion, the court to determine whether a breach of the peace occurred.

## 2. Personal Property in the Vehicle

In addition to their claim that the December 22, 2016 repossession violated the FDCPA, Gable and Castner contend that RPI violated the FDCPA by taking possession of their personal

property in the vehicle, holding that personal property, and charging them a fee to recover it. There is no dispute that Gable's contract with UAC permits the lender to "take items of personal property found in the Vehicle when we take back the Vehicle and hold them for you. If you do not claim them within 30 days or any other applicable time period required by law, we will dispose of them in a commercially reasonable manner." ECF No. 23-1 at 3; RPI PFOF ¶ 2. The Seventh Circuit has observed that the presence of such a term in the lending agreement is consistent with the reality that a repossessor takes possession of any personal property contained within a vehicle "not as collateral for the principal's loan but instead as an unintended incident to the repossession of that collateral." *Nadalin*, 169 F.3d at 1085.

Arguing in opposition to the motions for summary judgment, Gable and Castner assert that a jury could reasonably conclude that the $75 fee RPI demanded for return of their personal property was intended to be an impermissible payment to UAC. Assessing whether a similar, $25 fee charged by a repossessor to recover personal property violated the FDCPA, the Seventh Circuit in *Nadalin* observed that, "[s]o far as the [FDCPA] is concerned, the only thing that's important is that the repossessor was not acting as the lender's agent when in effect it asserted a lien in order to enforce its $25 fee." *Id.* at 1086. In that case, the Seventh Circuit noted that the incidental collection of personal property "was not a method of enforcing a debt owed to the lender" and did not occur in "an effort to claim and seize additional collateral for the loan." *Id.* at 1087. Under such circumstances, the court reasoned, the repossessor also has "to incur notice, storage, and related costs to protect itself from being sued successfully for conversion if [the debtor] should claim that it had kept the property." *Id.* at 1085.

Here, Gable and Castner do not dispute that the contract between UAC and RPI disclaims any agency relationship between the two and instead classifies RPI as an independent contractor.

UAC PFOF ¶ 10.  Gable also admits that he does not know whether the $75 fee that RPI sought to charge him to reclaim his personal property was a storage or administrative fee, and his lack of knowledge necessarily implies that he has no evidence regarding the actual purpose of the fee. Indeed, RPI does not dispute that its contract with UAC does not expressly permit it to charge a fee for personal property collection (PPFOF ¶ 13), and the absence of any term in that contract regarding fees for collection of personal property further undermines the plaintiffs' claim that RPI charged the $75 on UAC's behalf.  Based on these undisputed facts, the court finds that no reasonable jury could conclude that RPI was acting as UAC's agent and impermissibly charging the $75 fee to satisfy Gable's debt.  The plaintiffs' FDCPA claim with regard to the charging of such a fee will therefore be dismissed.  But since summary judgment on the repossession of the vehicle has been denied, the plaintiffs' claim for the value of that property remains in the case.

## B. Plaintiffs' Remaining Claims

In addition to their federal claims against RPI and Chase, Gable and Castner assert state law claims for conversion, statutory theft, illegal nonjudicial repossession, violations of the WCA, and unconscionable behavior against all of the defendants, and an additional false imprisonment against Chase alone.  Each will be addressed in turn.

### 1. Conversion and Statutory Theft Under Wis. Stat. § 895.446

The plaintiffs' second claim is for conversion and statutory theft against all of the defendants.  The claim is based upon the defendants' December 22, 2016 repossession of the 2004 Kia and refusal to return the vehicle until the plaintiffs paid $225, and their seizure and failure to return the personal property that the plaintiffs allege they were unable to remove before the car was taken on that date.  Though the plaintiffs appear to conflate them in their complaint, a common law

claim for conversion is not the same as a claim of statutory theft. Conversion is an intentional tort, but conversion does not include as an element criminal intent. In other words, a person is liable for conversion of another's property even if he takes the property with the good faith belief that he is entitled to do so. The crime of theft, in contrast, requires knowledge that the property taken legally belongs to another and the intent to permanently deprive the owner of possession of the property despite such knowledge. *See Lechner v. Ebenreiter*, 235 Wis. 244, 292 N.W. 913, 916 (1940) ("If Ebenreiter and Ankerson so knew, it is manifest that Ebenreiter had no reasonable grounds for believing the plaintiff guilty of larceny, as the taking of property openly or refusing to return it after taking it openly in the honest belief of ownership thereof and of right to take or retain it absolves from felonious intent.").

Section 895.446 of the Wisconsin Statutes authorizes the victim of criminal theft to bring a civil action against the perpetrator for recovery of any damages sustained thereby, exemplary damages of up to three times the actual loss, attorneys' fees, and costs of investigation and recovery. On a common law claim of conversion, on the other hand, a plaintiff can recover only actual damages unless he or she can show that the defendant acted maliciously and in intentional disregard of the plaintiff's rights. Wis. Stat. § 895.043(3); Civil JI 17-7.1. Here, the plaintiffs have offered no evidence that any of the defendants acted with criminal intent. In fact, Johnson did not take the vehicle on December 22, 2016, until police told him he could and Gable handed him the keys. It thus follows that the defendants cannot be held liable for theft and summary judgment must be granted on the plaintiffs' claims under Section 895.446.

The question is less clear as to the plaintiffs' claim for conversion. Conversion, according to the RESTATEMENT, "is an intentional exercise of dominion or control over a chattel which so

seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." RESTATEMENT (SECOND) OF TORTS § 222A (1965). Defendants RPI and Chase argue that they cannot be liable for conversion because Gable had no right to the car as a result of his failure to make the required payments under his loan agreement with UAC and because they did not commit a breach of the peace in repossessing his car. But for the reasons set forth above, I have already rejected the argument that the undisputed facts establish that RPI and Chase did not commit a breach of the peace. And the defendants have offered no authority for the proposition that they cannot be liable for conversion for the unlawful repossession of a car where the owner is in default under the loan agreement for which the car was pledged as security. There is also the personal property allegedly left in the trunk that was never returned to the plaintiffs. Absent more than the defendants have offered by way of argument or authority, summary judgment will be denied as to these defendants.

Defendant UAC offers the additional argument that it cannot be liable in conversion because neither RPI nor Chase were acting as its agent. Instead, UAC contends based on its contract with RPI that RPI was its independent contractor and Chase was an agent for RPI. UAC also notes that under the terms of its contract with RPI, RPI is required to indemnify and hold UAC harmless for any liability UAC incurs as a result of RPI's repossession attempts. But the fact that UAC may not be liable for the unlawful repossession does not mean it cannot be held liable for the conversion of the vehicle that followed. Once RPI took possession of Gable's car, indeed, before RPI even took possession, UAC was directly involved. RPI was acting at UAC's direction. It was UAC that decided what Gable had to do to get his car back once it was taken by RPI. In other words, while the car may not have been held in UAC's actual possession, it was at least in UAC's constructive

possession. And as explained above, the fact that UAC did not know its possession of the vehicle may have been unlawful does not mean it cannot be liable for conversion. It may have lacked any criminal intent, but it did not lack the intent to take possession of Gable's car as a result of his default under the loan agreement. Finally, that RPI agreed to indemnify UAC and hold it harmless for any liability it incurred as a result of RPI's repossession does not absolve UAC of any liability it may have to the plaintiffs. To the contrary, the indemnification and hold harmless provision assumes UAC could incur liability for RPI's conduct. I therefore conclude on the record as it now stands and in light of the arguments offered and authority cited by the parties that the defendants are not entitled to summary judgment on the plaintiffs' claim for conversion.

### 2. Illegal Nonjudicial Repossession

The third claim in the plaintiffs' complaint which is asserted against all of the defendants is for illegal nonjudicial repossession in violation of the WCA, and in particular, Section 425.206(2)(a). In essence, this seems little more than a restatement of the FDCPA claim for unlawful self-help repossession, except that this claim is asserted against UAC, as well as RPI and Chase. As to this claim, too, UAC contends it cannot be held liable because RPI was an independent contractor under its contract with UAC and not its agent, and Chase was apparently RPI's agent. The defendants also argue the Castner's claim should be dismissed since she was not the customer or debtor and therefore has no standing to assert a claim under WCA.

As the RESTATEMENT explains, the term "independent contractor" does not exclude an agency relationship: "[T]he common term 'independent contractor' is equivocal in meaning and confusing in usage because some termed independent contractors are agents while others are nonagent service providers." RESTATEMENT (THIRD) OF AGENCY § 1.01, cmt. c (2006). Thus,

16

"[w]hether a relationship is characterized as agency in an agreement between parties or in the context of industry or popular usage is not controlling." *Id.* § 1.02.

Regardless of the language UAC included in its contract with RPI, it was UAC that directed RPI to repossess Gable's car, and it is UAC that falls within the definition of merchant contained in the WCA. The WCA states that "[i]n taking possession of collateral or leased goods, no merchant may . . . [c]ommit a breach of the peace." Wis. Stat. § 425.206(2)(a). The WCA defines "merchant" as:

> a person who regularly advertises, distributes, offers, supplies or deals in real or personal property, services, money or credit in a manner which directly or indirectly results in or is intended or designed to result in, lead to or induce a consumer transaction. The term includes but is not limited to a seller, lessor, manufacturer, creditor, arranger of credit and any assignee of or successor to such person. The term also includes a person who by his or her occupation holds himself or herself out as having knowledge or skill peculiar to such practices or to whom such knowledge or skill may be attributed by his or her employment as an agent, broker or other intermediary.

Wis. Stat. § 421.301(25). UAC, not its repossessors, falls within this definition and is therefore covered by the WCA. It was UAC's authority to repossess Gable's car that RPI was exercising. That UAC chose to authorize RPI to exercise its right under Wisconsin law to take possession of its collateral extra-judicially does not mean it can avoid liability for actions taken on its behalf and at its request. Again, the fact that it required RPI to agree to indemnify and hold it harmless for UAC's liability arising out of RPI's acts does not immunize UAC from any direct liability it may have to the plaintiffs. It is also significant that in this case, Castner phoned UAC as the repossession was in progress and was told by a UAC representative that in order to stop the repossession, Gable would have to immediately pay make at least one payment. Based on this evidence, a jury could conclude that UAC was directly involved in the allegedly unlawful repossession. Had UAC's

17

representative told Johnson to cease his repossession efforts in the face of the debtor's objection, no breach of the peace would have occurred. Accordingly, UAC may be liable for the breach of the peace under the WCA at least as to Gable.

The same is not true for Castner, however. A key purpose of the WCA is "[t]o protect customers against unfair, deceptive, false, misleading and unconscionable practices by merchants." Wis. Stat. § 421.102(2)(b). The WCA defines "Customer" as "a person other than an organization (s. 421.301(28)) who seeks or acquires real or personal property, services, money or credit for personal, family or household purposes or, for purposes of ch. 427 only, for agricultural purposes." Wis. Stat. § 421.301(17). "Customer," as defined by the WCA also includes a person other than a customer who agrees to be governed by the WCA with respect to all aspects of a transaction, but only as to that transaction. *Id.* The remedies available for a violation of Chapter 425, including wrongful repossession, are "liberally administered to the end that the *customer as the aggrieved party* shall be put in at least as good a position as if the creditor had fully complied with chs. 421 to 427." Wis. Stat. § 425.301(1) (italics added). Castner clearly does not fall under this definition. Thus, while she can sue for conversion of her personal property that was allegedly left in the vehicle, she has no claim under the WCA for wrongful repossession of Gable's vehicle.

### 3. Violation of Section 427.104

The fourth claim of the complaint alleges that the defendants violated Section 427.104 of the Wisconsin Statutes, a section of the WCA that prohibits certain debt collection practices. The complaint appears to allege that the defendants engaged in two of the prohibited practices listed in the statute. It alleges that "in holding plaintiffs' personal property, and in then saying that plaintiff must pay $75 to retrieve that property, all defendants directly or indirectly engaged in conduct

which could be reasonably expected to harass the plaintiffs." Compl. ¶ 58. The complaint also alleges under this claim that "in taking the vehicle and personal property in the manner alleged herein, all defendants claimed a right (to seize, hold, and sell plaintiffs' property) with reason to know said right did not exist (because the nonjudicial repossession was accomplished as a breach of the peace and because under no circumstances did any defendant have the right to keep plaintiffs' personal property)." *Id*. at 59. These allegations apparently are intended to allege violations of Section 427.104(1)(g) and (j).

In their respective motions seeking summary judgment, the defendants do not directly address the merits of the alleged violations, though for the reasons stated above, the plaintiffs' claim that the defendants violated the WCA by charging them $75 for the return of their personal property likely fails, since it appears the $75 was an administrative or storage charge by the repossessor and there is no evidence it was an effort to collect a debt. To the extent it addresses this claim at all, UAC essentially repeats its argument that since it was not present at the repossession incident, it cannot be liable. All of the defendants argue that Castner has no standing to assert a claim under the WCA since she was not the debtor.

The WCA defines the term "Debt collector" as "any person engaging, directly or indirectly, in debt collection, and includes any person who sells, or offers to sell, forms represented to be a collection system, device or scheme, intended or calculated to be used to collect claims." Wis. Stat. § 427.103(3). Unlike the FDCPA, the WCA includes within its coverage merchants engaged in collecting their own debts, as well as collectors of debts owed third parties. *See* 15 U.S.C. § 1692a(6) (defining "debt collector" as a person who endeavors to collect the debts owed to "another"). UAC clearly falls within this definition since it was directly engaged in collecting the

19

debt Gable owed it. RPI and Chase appear to fall within the definition, as well, since they were indirectly assisting UAC in the collection of its debt. Accordingly, all three could be liable to Gable if the violations alleged are established.

As for Castner's standing to bring a claim for violating the WCA debt collection provisions, the issue is not as clear-cut as the defendants suggest. It is true that Castner was not UAC's customer; nor was she a debtor under the loan agreement. But the protections afforded by the WCA are not limited to customers and debtors. Whether a person has standing to assert a claim under the WCA depends on "whether the party seeking standing was injured in fact, and whether the interest allegedly injured is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Zehetner v. Chrysler Fin. Co., LLC*, 2004 WI App 80, ¶ 12, 272 Wis.2d 628, 679 N.W.2d 919. Unlike the remedies available for a violation under Chapter 425, the remedies available for a violation of Chapter 427 governing debt collection practices apply to "a person injured by violation of this chapter . . . ." Wis. Stat. § 427.105(1). The record is not sufficiently developed to permit a determination as to whether Castner has standing to bring a claim for violations of Section 427.104. The defendants' motions for summary judgment on her claim will be denied for now as well.

### 4. Unconscionable Behavior

The plaintiffs' fifth claim for relief is entitled "unconscionable behavior." Though not stated in the complaint, the plaintiffs explain in their opposition to the defendants' motions for summary judgment that the claim seeks relief for a violation of Section 425.107 of the Wisconsin Statutes. That section provides in pertinent part:

> With respect to a consumer credit transaction, if the court as a matter of law finds that any aspect of the transaction, any conduct directed against the customer by a

> party to the transaction, or any result of the transaction is unconscionable, the court shall, in addition to the remedy and penalty [under Wis. Stat. § 425.303], either refuse to enforce the transaction against the customer, or so limit the application of any unconscionable aspect or conduct to avoid any unconscionable result.

Wis. Stat. § 425.107(1).

Three separate courts have now held that this section provides a defense to an action brought by a creditor and does not constitute an affirmative claim for relief. *See Riel v. Navient Sols. Inc.*, No. 16-CV-1191-JPS, 2017 WL 168900, at *3 (E.D. Wis. Jan. 17, 2017); *VanHuss v. Rausch, Sturm, Israel, Enerson & Hornik*, No. 16-CV-372-SLC, 2017 WL 1379402, at *10 (W.D. Wis. Apr. 14, 2017); and *Sec. Fin. v. Kirsch*, No. 2017AP1408 , 2018 WI App 35, 382 Wis. 2d 271, 915 N.W.2d 730. I find the analysis of these courts persuasive. As the court in *Riel* explained, subchapter one of Wis. Stat. ch. 425 is subject to Wis. Stat. § 425.102, which provides that "[t]his subchapter applies to actions or other proceedings brought by a creditor to enforce rights arising from consumer credit transactions and to extortionate extensions of credit under [Wis. Stat. §] 425.108." By the statute's plain language, this scope provision does not permit the plaintiffs to enforce a claim for unconscionability against a creditor via a separate lawsuit. Summary judgment is therefore granted on the plaintiffs' fifth claim.

### 5. False Imprisonment

The plaintiffs' sixth claim is a common law state law claim for false imprisonment against Chase alone based on the allegations that Chase deprived the plaintiffs of the freedom of movement when on March 29, 2017, Johnson parked his tow truck directly behind the 2004 Kia in an effort to again take possession of it. The plaintiffs claim they were unable to back up in their car because of Johnson's actions and they waited as long as twenty minutes before a police officer arrived and directed Johnson to move his truck.

The Wisconsin Supreme Court has defined the tort of false imprisonment as "[t]he unlawful restraint by one person of the physical liberty of another." *Maniaci v. Marquette Univ.*, 50 Wis. 2d 287, 295, 184 N.W.2d 168 (1971) (citing *Lane v. Collins*, 29 Wis. 2d 66, 69, 138 N.W.2d 264, 266 (1965)). Under the RESTATEMENT,

 An actor is subject to liability to another for false imprisonment if

(a) he acts intending to confine the other or a third person within boundaries fixed by the actor, and

(b) his act directly or indirectly results in such a confinement of the other, and

(c) the other is conscious of the confinement or is harmed by it.

RESTATEMENT (SECOND) OF TORTS § 35 (1965). In order to constitute a false imprisonment, "the other's confinement within the boundaries fixed by the actor must be complete." *Id.* § 36(1). One "does not become liable for false imprisonment by intentionally preventing another from going in a particular direction in which he has a right or privilege to go." *Id.* 36(3); *see also* cmt. d ("In order to make the actor liable for false imprisonment under the rule stated in § 35, it is necessary that he shall have confined another in a particular area, the boundaries of which are fixed by the will of the actor. It is not enough that the other's freedom of movement has been improperly restricted.").

In this case, it is clear that Johnson did not intend to confine the plaintiffs within fixed boundaries. He didn't intend to confine them at all; what he intended was to repossess Gable's car. It is also clear from the undisputed facts that the plaintiffs were not confined. They were free to leave their car, and in fact they did so to call the police. Johnson's actions may well have been unlawful, but they do not amount to the tort of false imprisonment. Accordingly, summary judgment will also be granted as to this claim.

### C. Remaining Issues

UAC also seeks to limit the plaintiffs' damages for the claims that survive. UAC argues that the plaintiffs have not sustained emotional distress damages and have no grounds to recover punitive damages. The emotional distress the plaintiffs claim is not a separate claim, but a component of the damages they seek for the surviving claims asserted in their complaint. The same is true of the punitive damages they seek. The WCA explicitly allows recovery for emotional distress caused by violations. Wis. Stat. § 427.105(1) ("A person injured by violation of this chapter may recover actual damages and the penalty provided in s. 425.304; but notwithstanding any other law actual damages shall include damages caused by emotional distress or mental anguish with or without accompanying physical injury proximately caused by a violation of this chapter."). Punitive damages are recoverable for intentional torts, such as conversion. The plaintiffs have alleged serious emotional and psychological difficulties they attribute to the repossession of Gable's vehicle and the loss of their child's Christmas presents that were in the trunk when the vehicle was taken. They have also alleged a blatant disregard of their rights under Wisconsin law. In light of the allegations and remaining claims, summary judgment is not an appropriate vehicle to limit damages. UAC may renew its request at trial if the evidence does not support such damages. For now, they will remain in the case.

### CONCLUSION

For the foregoing reasons, Defendant UAC's motion for summary judgment (ECF No. 24) and Defendants RPI and Chase's motion for summary judgment (ECF No. 21) are **GRANTED-IN-PART** and **DENIED-IN-PART**. Summary judgment is **DENIED** on the FDCPA claims against RPI and Chase arising out of the December 22, 2016 repossession of Gable's 2004 Kia. Summary judgment is likewise **DENIED** as to the plaintiffs' state law claims for conversion and

violations of Section 427.104, as well as Gable's claim of illegal nonjudicial repossession. Summary judgment will be **GRANTED** as to Castner's claim for illegal nonjudicial repossession and as to both the plaintiffs' claims for unconscionable behavior and false imprisonment. UAC's motion to strike the plaintiffs' emotional distress and punitive damage claims is **DENIED**.

      **SO ORDERED** this   17th   day of September, 2018.

                                      s/ William C. Griesbach
                                      William C. Griesbach, Chief Judge
                                      U.S. District Court - WIED